**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 25-70-BLG-WWM |
| Plaintiff, | |
| vs. | ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS |
| JEREMY RAY GEORGE, | |
| Defendant. | |

Before the Court is a Motion to Suppress filed by Defendant Jeremy Ray George ("Mr. George"). (Doc. 35). Mr. George is charged with being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). The charge arises from a traffic stop conducted on May 15, 2025, and the subsequent search of Mr. George's residence. (Doc. 1-1). Mr. George moves to suppress all evidence obtained after the conclusion of the traffic stop, arguing that the traffic stop was unlawfully prolonged. (Doc. 36 at 14, 24). The United States opposes the Motion. (Doc. 43). In its briefing and at the evidentiary hearing, the prosecution says Mr. George's arguments are not well taken because law enforcement had reasonable suspicion that he was in possession of stolen firearms, which was established through the confidential informant prior to the traffic stop.

(Doc. 43 at 1-2). The prosecution further argues that the subsequent search was legal as both a search pursuant to the conditions of Mr. George's probation and through his consent. (*Id.* at 14). The Court held an evidentiary hearing on January 9, 2026. (Doc. 46).

For the following reasons, the Court denies the Motion to Suppress. The Court finds that the traffic stop was legally viable. It was prolonged beyond the mission of the stop, but law enforcement had reasonable suspicion of independent wrongdoing for the entire duration of the traffic stop due to the confidential informant's report. Although Mr. George's consent to a search of his residence and admission of possession of firearms do not form a legal basis for the search on the record here, law enforcement officers had authorization from the probation office to conduct a search pursuant to its authority based upon the disclosure from the confidential informant.

## I.      Factual Background

In September 2017, Mr. George was convicted of a felony offense in state court in Montana. (Doc. 43 at 3; Doc 43-1). As part of his sentence, he received a term of probation scheduled to expire in 2032. (Doc. 43 at 3). As a requirement of supervision, Mr. George signed an agreement to abide by several conditions. (Doc. 43-1). The conditions relevant to the present matter include:

2

5. **WEAPONS**: I will not use, own, possess, transfer, or be in control of any firearms, ammunition (including black powder), or weapons. I will not possess chemical agents such as O.C. or pepper spray.

. . .

7. **SEARCH OF PERSON OR PROPERTY**: Upon reasonable suspicion, as ascertained by a Probation/Parole Officer, my person, vehicle, and/or residence may be searched at any time, day or night, including my place of employment, without a warrant by a Probation/Parole Officer, ISP Officer or Law Enforcement Officer (at the direction of the Probation/Parole/ISP Officer). Any illegal property or contraband will be seized and may be destroyed.

. . .

**FIREARM REGULATIONS**: I cannot possess or own firearms or ammunition. Federal law prohibits a convicted felon from possessing or receiving firearms or ammunition [Title 18, United States Code, Section 922(g)(1)]. Therefore, I understand I could be prosecuted for violating Federal law. I also understand I could be punished for violating my conditions of supervision AND federally prosecuted.

(Doc. 43-1 at 1, 7).

On May 14, 2025, a confidential informant reported to Detective Steve Hallam ("Detective Hallam") of the Billings Police Department's Street Crimes Unit ("BPD SCU") that a man named Jeremy George was in possession of three firearms that were possibly stolen. (Doc. 50-1 at 3). The informant reported that they had personally seen Mr. George with the firearms.[1] The informant, who believed Mr. George was on probation, provided Detective Hallam with

---

[1] The Court relies on the officers' written statements and body camera footage, attached as exhibits to Mr. George's motion, and testimony given during the evidentiary hearing. Where no docket item is cited, the Court is referring to testimony provided at the hearing.

3

Mr. George's address and said that Mr. George drove a black Hyundai passenger vehicle. (Doc. 50-1 at 3).

On the following day, Detective Hallam verified this information, confirming that Mr. George is on state probation until 2032 and that his address in the Montana Sexual or Violent Offender Registry matched the one provided by the informant. (*Id.*). At around noon, Detective Hallam talked by phone with Mr. George's probation officer, Tom Fulton ("Officer Fulton"), and Probation and Parole Sergeant Micky Eckart ("Sergeant Eckart"). (Doc. 46 at 1; Doc. 50-1 at 3). Officer Fulton reported that Mr. George had been compliant with the terms of his probation and that the department was even pursuing an early discharge. (Doc. 50-1 at 3). Officer Fulton told Detective Hallam that Mr. George messaged him earlier that day and requested permission to be transferred to Kalispell for work, but Officer Fulton still needed to conduct a "home check." (*Id.*). Detective Hallam recounted what he learned about Mr. George from the confidential informant to Officer Fulton and Sergeant Eckart, specifically noting that the informant had personally observed Mr. George in possession of the firearms. (*Id.*). When Detective Hallam asked Sergeant Eckart how they wished to proceed, Sergeant Eckart told Detective Hallam to call him if he were to stop Mr. George. (*Id.*).

4

Early the next day, Sergeant Eckart entered a chronological note in Montana

Probation's electronic documents system in which he described the information

conveyed by Detective Hallam as credible. (Doc. 50-2 at 1-2) ("I received a phone

call from Billings PD Detective Halem [sic]. He advised me that they had stopped

Jeremy George for speeding and fail [sic] to use turn signal. Det. Halem [sic]

advised he received information from a credible source that Jeremy George had

stolen guns at his residence. I requested he search George's residence and let me

know what was found."). At the hearing on the suppression motion, Sergeant

Eckart testified that he labeled the information "credible" because the informant's

knowledge was based upon a firsthand account. Instead of simply going to Mr.

George's residence to execute a search pursuant to his conditions of probation,

Detective Hallam worked with fellow officers in the BPD SCU to conduct a traffic

stop after he left his residence to "separate [Mr. George] from any firearms in his

residence minimizing any potential dangerous outcomes." (Doc. 50-5 at 1).

At around 2:00 p.m. that day, Detective Hallam and other officers of the

BPD SCU began surveillance of Mr. George's residence. (*Id.*). At 6:55 p.m.,

Detective Hallam witnessed Mr. George leave the property in the passenger seat of

a black Hyundai registered to his wife, Shalynn George ("Mrs. George"). (*Id.*

at 4). Detective Hallam notified the other officers of the BPD SCU surveilling the

residence that Mr. George left the property in the Hyundai. (*Id.*). Sergeant

Benjamin Beck ("Sergeant Beck") followed the Hyundai and at 7:15 p.m. activated

his emergency lights upon witnessing Mrs. George exit a traffic circle without

signaling. (Doc 36-4 at 19:15:50).[2] BPD Officer Dustin Stroble ("Officer

Stroble") had been following directly behind Sergeant Beck in his vehicle when

Sergeant Beck pulled over the Hyundai, and he conducted the traffic stop with

Sergeant Beck. (Doc. 50-4 at 1; Doc. 36-4 at 19:16:40–19:18:00).

At 7:16 p.m., after Sergeant Beck and Officer Stroble informed Detective

Hallam of the traffic stop, Detective Hallam called Sergeant Eckart. (Doc. 50-1

at 4; Doc. 46 at 1).[3] Detective Hallam told Sergeant Eckart that they had pulled

over Mr. George, reiterated the information received from the confidential

informant, and reminded him that Officer Fulton still needed to conduct a home

---

[2] Sergeant Beck's body camera footage begins at approximately 7:15 p.m. and he can be seen, but not heard, speaking into his radio. (Doc. 36-4 at 19:15:17–19:15:43). When the audio turns on, a voice, presumably Detective Hallam's, says "–on probation. I'll give Micky [Sergeant Eckart] a call." (*Id.* at 19:15:44).

[3] Mr. George argued in his brief and at the evidentiary hearing that Detective Hallam did not call Sergeant Eckart and receive authorization to conduct a probationary search until after the conclusion of the traffic stop. (Doc. 36 at 5-6, 9, 13, 19). The record does not support this contention. Sergeant Eckart testified that he spoke with Detective Hallam at the outset of the traffic stop and gave him authorization to conduct a probationary search of Mr. George's residence. Sergeant Eckart testified that he received a second phone call that evening after Detective Hallam spoke with Mr. George and received written consent. (*Id.*, 10:8–10:11). Furthermore, Detective Hallam's phone records, admitted as evidence at the hearing, confirm that Detective Hallam called Sergeant Eckart before and after Detective Hallam arrived at the traffic stop, substantiating Detective Hallam and Sergeant Eckart's claim that Detective Hallam received authorization to conduct a probation search prior to his arrival at the traffic stop. (*Id.* at 60:10–61:15).

check on Mr. George's residence. (Doc. 50-1 at 4). In turn, Sergeant Eckart

requested that Detective Hallam and the other officers of the BPD SCU search

Mr. George's residence, "under [Sergeant Eckart's] probation and parole

authority." (*Id.*). Sergeant Eckart testified that as a sergeant with probation and

parole, he had the authority to authorize a search of Mr. George's residence,

vehicles, and person, which is set forth in the conditions attached to Mr. George's

probation. Sergeant Eckart asserted that he authorized the search based on

reasonable suspicion derived from the informant's "credible information." He

further explained that the information is described as credible in his written report

of May 16th because it came from a person with a first-hand account based upon

observation of the firearms.

Meanwhile, Sergeant Beck approached the Georges' driver-side window and

informed Mrs. George that she failed to use a turn signal in the roundabout.

(Doc. 36-4 at 19:16:44). Sergeant Beck collected Mrs. George's driver's license,

proof of insurance, and vehicle registration. (*Id.* at 19:17:00–19:17:30). Officer

Stroble simultaneously approached the passenger-side window and collected

Mr. George's driver's license. (Doc. 36-5 at 19:17:00–19:18:00). Sergeant Beck

and Officer Stroble then walked back to Sergeant Beck's vehicle together and

Sergeant Beck began preparing a traffic warning. (*Id.* at 19:18:30–19:19:18).

7

When Officer Stroble noticed that Mr. George was calling someone on his cell phone, Sergeant Beck radioed Detective Hallam and asked if he wanted them "to grab phones." (*Id.* at 19:19:18–19:19:32). Detective Hallam responded, "Have you asked if he is on paper yet? And ask him who his P.O. is and then I'll be over there in a minute. Give time now for me to place the call." (*Id.* at 19:19:34–19:19:46).

While Sergeant Beck called in the Georges' information and prepared the traffic warning, he directed Officer Stroble to verify Mr. George's probationary status. (*Id.* at 19:20:15–19:20:22). Officer Stroble approached the vehicle's passenger window and asked whether either of them was on probation. (Doc. 36-5 at 19:20:21–19:20:26). Mr. George reported that he was and identified Officer Fulton as his probation officer. (*Id.* at 19:20:26–19:20:30). When asked whether he was in compliance with the terms of his probation, Mr. George responded "absolutely." (*Id.* at 19:20:42).

At 7:22 p.m., Detective Hallam arrived at the traffic stop and parked his vehicle behind Officer Stroble's. (Doc. 36-1 at 19:22:00). Detective Hallam radioed Sergeant Beck and asked whether Mr. George admitted his probationary status. (Doc. 36-4 at 19:24:40–19:24:43). After Sergeant Beck confirmed it, Detective Hallam said he was going to approach the Georges' vehicle. (Doc. 36-1

at 19:24:49).

Sergeant Beck continued to finalize the traffic warning while Detective Hallam spoke with Mr. George at his vehicle. (Doc. 36-1 at 19:25:40–19:29:29). The conversation went as follows:

> DETECTIVE HALLAM: Hey, so Tom Fulton's your P.O., right?
>
> MR. GEORGE: Yeah, I just messaged him.
>
> DETECTIVE HALLAM: So, I talked with him, and it sounds like you're trying to get to Kalispell for a job.
>
> MR. GEORGE: Eventually.
>
> DETECTIVE HALLAM: Okay. When are you looking at going?
>
> MR. GEORGE: Depends on what time my brother can set it up.
>
> DETECTIVE HALLAM: Okay. And he said the only thing he has to do is he needs to do a home check, search your property. So, I think we're going to knock that out under his authority, alright?
>
> MR. GEORGE: Okay. When are you wanting to do that?
>
> DETECTIVE HALLAM: Now. We'll knock it out of the way.

(*Id.* at 19:25:40–19:26:17).

Immediately thereafter, Detective Hallam collected Mr. and Mrs. George's phones. (*Id.* at 19:26:18–19:26:56). Mr. and Mrs. George stated that they did not like what was going on and Mr. George asked if he could call his probation officer to get verification. (*Id.* at 19:26:53–19:27:12). Detective Hallam denied this request and repeated that probation asked him to search the residence "under their

9

authority." (*Id.* at 19:27:03–19:27:30).

Meanwhile, Sergeant Beck finished filling out the traffic warning and approached the vehicle. (Doc. 36-4 at 19:27:29–19:29:29). He initially started toward the passenger side, but upon seeing Detective Hallam ask Mr. George to step out of the vehicle, changed direction and went to the driver's side where he explained to Mrs. George that he was giving her a warning. (*Id.* at 19:29:42–19:29:56). At 7:30 p.m., Sergeant Beck handed Mrs. George both licenses, her vehicle registration, and the traffic warning. (*Id.* at 19:30:10).[4] As Mrs. George took the warning from Sergeant Beck, she explained to Detective Hallam that she was worried about how far the situation between Mr. George and Detective Hallam was escalating because Mr. George was "very autistic" and had a seizure disorder. (*Id.* at 19:29:58–19:30:30). Sergeant Beck walked around the vehicle to the passenger side and watched the rest of the interaction. (*Id.* at 19:30:30).

As Sergeant Beck was approaching the vehicle with the traffic warning, Detective Hallam asked Mr. George to step out of the vehicle. (Doc. 36-1 at 19:29:03–19:31:01). Detective Hallam told Mr. George that he was not under arrest, but he was going to advise him of his rights. (*Id.* at 19:31:01–19:31:07). Detective Hallam advised Mr. George of his *Miranda* rights, and Mr. George

---

[4] At this point, the mission of the traffic stop had concluded.

verbally indicated that he understood. (*Id.* at 19:31:07–19:32:35). Detective Hallam then told Mr. George that he received information that he might be in possession of firearms. (*Id.*). Mr. George admitted that he had been holding two of his landlord's firearms for a week while the landlord was out of town to prevent them from being stolen. (*Id.* at 19:32:42–19:33:55). Acknowledging that he was not supposed to possess firearms, Mr. George told Detective Hallam where he could find them, stated that they were not loaded, and confirmed that he only had two. (*Id.* at 19:33:55–19:35:50).

Detective Hallam left Mr. George with Sergeant Beck, walked back to his vehicle, and called Officer Stroble to inform him of what he learned. (*Id.* at 19:36:08–19:38:28). Detective Hallam told Officer Stroble that Sergeant Eckart had given them authorization to search Mr. George's residence on behalf of probation, but nevertheless he was going to have Mr. George sign a written consent form so that there was no "gray area." (*Id.* at 19:38:26–19:40:26). In this conversation, Detective Hallam stated that the confidential informant asked Mr. George whether he still had the firearms earlier that day, and Mr. George confirmed that he did. (*Id.* at 19:39:41–19:39:48).[5]

---

[5] This is not reflected in Detective Hallam's written report.

Detective Hallam went back to Mr. George's vehicle with a written consent waiver and told Mr. George, "Okay so here's what we're going to do: I'd like to get the written consent for your trailer to go in there and get the firearms." (*Id.* at 19:43:18–19:43:27). After Mr. George agreed, Detective Hallam added, "I have to take a peek in your car, if you guys are okay with that." (*Id.* at 19:43:27–19:43:34). Mr. George again agreed. (*Id.*). Detective Hallam filled out the consent waiver, read its contents aloud, and both Mr. and Mrs. George signed it. (*Id.* at 19:44:48–19:48:36).

Just before 8:00 p.m., Mr. and Mrs. George drove to their residence with Detective Hallam and Sergeant Beck following. (*Id.* at 19:54:40). Detective Hallam called Sergeant Eckart during his drive to the Georges' residence and told him that they received Mr. George's consent to search his residence. (Doc. 46 at 1). Detective Hallam asked whether probation consented to BPD placing Mr. George in custody on a probation violation, which Sergeant Eckart authorized.

Ultimately, BPD SCU seized three firearms from Mr. George's residence. (Doc. 50-1 at 6). Mr. George was placed under arrest and brought to Yellowstone County Detention Facility on a probation violation. (*Id.*).

## II.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in

12

their persons, house, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has repeatedly affirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).

In order to effectuate the Fourth Amendment's protection, defendants have the right to have any evidence secured by means of an unlawful search and seizure excluded from trial, upon motion and proof. *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)); Fed. R. Crim. P. 12(b)(3)(C). Characterized as "fruit of the poisonous tree," evidence seized as a result of an unlawful search or seizure is subject to exclusion unless it has been sufficiently "purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 485-88 (1963). A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

## III.  Discussion

Mr. George does not contest the lawfulness of the initial traffic stop. (Doc. 36 at 16). By stating that the authority of the traffic stop was "limited to the initial 'mission' of the stop," Mr. George does not appear to take issue with the legal viability of the stop. (*Id.*). Sergeant Beck's observation of Mrs. George

exiting a traffic circle without signaling—a violation of Montana Code Annotated § 61-8-336—provided sufficient justification for a lawful traffic stop. *See Whren v. United States,* 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Given the legitimacy of the initial traffic stop, the Court now turns to the remaining issues: whether the traffic stop was unlawfully prolonged and whether the subsequent search of Mr. George's residence was authorized based upon the conditions of his probation sentence or pursuant to Mr. George's consent.

    *a.    Duration of the Stop*

A traffic stop "can only last as long as is reasonably necessary to carry out the 'mission' of the stop, unless police have an independent reason to detain the motorist longer." *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017). The "mission" of a traffic stop includes determining whether to issue a traffic ticket and "ordinary inquiries incident to the stop." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015); *see also United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019); *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's

14

registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. Police may order the driver to exit the vehicle, request identification, and ask questions about travel without exceeding the scope of a traffic stop. *Id.* at 356. In short, "[w]hen the police pull someone over for a traffic violation, the officer can obviously investigate that traffic infraction." *United States v. Ramirez*, 98 F.4th 1141, 1143–44 (9th Cir. 2024).

An officer may also "take certain negligibly burdensome precautions in order to complete his mission safely," because officer safety "stems from the mission of the stop itself." *Rodriguez*, 575 U.S. at 356; *see also United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022) (finding criminal history checks to be a "negligibly burdensome precaution" necessary to complete the stop safely). However, the precaution must actually "advance officer safety." *Evans*, 786 F.3d at 787.

If a stop exceeds the time needed to "handle the matter for which the stop was made," then it violates the Fourth Amendment. *Rodriguez*, 575 U.S. at 350. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. There is no "de minimis" exception; any time added to a traffic stop that is unrelated to the mission is unlawful. *Landeros*, 913 F.3d at 867. Even so, police "may conduct certain

unrelated checks" during a traffic stop, but they "may not do so in a way that prolongs the stop absent reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. The Fourth Amendment thus tolerates investigations unrelated to the purpose of the stop, as long as it is done "*within* the time reasonably required to complete the stop's mission." *Gorman*, 859 F.3d at 715 (citing *Rodriguez*, 575 U.S. at 355) (emphasis in original) (internal quotations omitted). The critical question is whether the check "prolongs—i.e. adds time to—the stop." *Rodriguez*, 575 U.S. at 357.

Nevertheless, if police have reasonable suspicion of an independent offense, the traffic stop may be extended to investigate those matters. *Landeros*, 913 F.3d at 867. "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Id.* at 868 (internal quotations omitted) (emphasis in original). This determination is based on the totality of the circumstances, with appropriate deference to the inferences drawn by the officer on the scene. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Valdes-Vega*, 738 F.3d 1074, 1077-79 (9th Cir. 2013) (en banc).

Reasonable suspicion "is not a particularly high threshold to reach and is less than probable cause or a preponderance of evidence." *United States v. Taylor*,

60 F.4th 1233, 1241 (9th Cir. 2023) (internal citations and quotations omitted); *see also Arvizu*, 534 U.S. at 274 (stating reasonable suspicion falls "considerably short" of preponderance of the evidence). Nonetheless, the facts justifying a search or a stop must be "known to officers" at the time of the search or stop. *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (internal citations omitted).

Here, the traffic stop's mission concluded after about 14 minutes when Sergeant Beck issued Mrs. George the warning and returned the licenses and registration. Mr. George argues that the traffic stop was unlawfully prolonged in two ways: first, by Sergeant Beck delaying the traffic stop to wait for Detective Hallam to request a probationary search; and second, by Detective Hallam's continued questioning of Mr. George after Sergeant Beck issued the traffic warning. (Doc. 36 at 18-19). Applying the aforementioned rules, the Court concludes that the officers had sufficient reasonable suspicion to justify prolonging the traffic stop given the information obtained from the confidential informant.

### i.    *Confidential Informant*

Whether an informant's tip is sufficient to support reasonable suspicion depends on the totality of the circumstances, taking into consideration the informant's veracity, reliability, and the basis of their knowledge. *United States v.*

*Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (*citing Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Reasonable suspicion can arise from less reliable information than that required for probable cause, which requires a "fair probability" that evidence of a crime will be found. *Id.* (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion is dependent on both "quantity and quality:" the content of information possessed by police and its degree of reliability. *Id.* "Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.*

Courts look to several factors to determine the reliability of an informant's tip. *Id.* These factors include whether the informant (1) is known, (2) has a proven track record of reliability, (3) reveals the basis of their knowledge, and (4) provides predictive information. *Id.* at 907-08.

### 1.    *Known Informant*

A known informant's tip is more reliable than an anonymous informant's tip because they can be questioned about how they know the information and why they are motivated to provide the tip, and they can be held accountable for providing false information in violation of the law. *Id.* at 907-08 (citing *Florida v. J.L.*, 529 U.S. 266, 271 (2000)); *see also United States v. Terry-Crespo*, 356 F.3d

18

1170, 1174 (9th Cir. 2004). The informant's tip is considered more reliable if they do not have "any apparent motive to fabricate the tip," which can only be known if the informant's identity is known. *Rowland,* 464 F.3d at 908. Here, Detective Hallam knew the identity of the confidential informant. (*See* Doc. 50-1 at 3) (identifying the informant as CI #361529). This factor weighs in favor of reliability.

### 2. *Proven Track Record of Reliability*

"[A]n informant with a proven track record of reliability is considered more reliable than an unproven informant." *Rowland,* 464 F.3d at 908 (citing *Adams v. Williams,* 407 U.S. 143, 147 (1972)).

Mr. George cites to the Court's decision in *United States v. Roberts* to support the conclusion that "courts do not accept an affiant's unsupported assertion that a source is reliable." No. CR 24-99-BLG-SPW, 2024 U.S. Dist. LEXIS 213133, at *7 (D. Mont. Nov. 22, 2024) (in turn citing *United States v. Allen,* 211 F.3d 970, 975–76 (6th Cir. 2000); *United States v. Reddrick,* 90 F.3d 1276 (7th Cir. 1996)). The support in that case came from the Sixth and Seventh Circuits. Conversely, the Ninth Circuit does not appear to require officers to give more than their sworn testimony that the informant has proven to be reliable in the past. The Ninth Circuit in *Rowland* cited to the Supreme Court's decision in *Adams v.*

*Williams* to support the relevance of this factor. *Id.* In *Williams*, the Supreme Court found it supportive of reasonable suspicion that "[t]he informant was known to him personally and had provided him with information in the past." 407 U.S. at 146. There, the Court had no information other than the informant was "known to [the officer] and considered by him to be trustworthy and reliable." *Williams v. Adams*, 436 F.2d 30, 31 (2d Cir. 1970), *overturned by Williams*, 407 U.S. at 149.

Here, Detective Hallam's confidential informant was a registered informant with BPD SCU. (Doc. 50-1 at 3). Detective Hallam testified under oath that he had used this informant's information six times in the past in other drug and firearm matters. Detective Hallam further testified that the information previously provided proved to be accurate. (*Id.*, 28:1–28:7, 48:16–48:17). This is not an "unsupported assertion that a source is reliable," as discussed in *Roberts*. Without revealing or jeopardizing his informant's identity, Detective Hallam provided as much detail as necessary to demonstrate that this informant had a proven track record of reliability. This factor additionally weighs in favor of reliability.

### 3.    *Basis of Information*

An informant is considered more reliable if they reveal "the basis of knowledge of the tip," or "how the informant came to know the information." *Rowland*, 464 F.3d at 908 (internal citations omitted). First-hand observations are

more reliable than "rumor or innuendo." *United States v. Williams*, 10 F.3d 590,

594 (8th Cir. 1993). In *Rowland*, for example, the informant said he had personal

knowledge of the defendant's activities because he had "dealt with him in the

past." *Rowland*, 464 F.3d at 908. This was enough to support the informant's

reliability. *Id.* at 909; *cf Roberts*, 2024 U.S. Dist. LEXIS 213133, at *7 (finding

the fact that the informant never told the officer how he learned of the information

inimical to reliability).

Here, the confidential informant told Detective Hallam that they had

personally witnessed Mr. George with the firearms.[6] (Doc. 50-1 at 3; Doc. 36-1 at

19:39:41–19:39:48). Though the informant did not know, and only suspected, that

the firearms were stolen, that fact is not relevant to the officers' reasonable

suspicion of wrongdoing given that Mr. George was not legally allowed to possess

firearms, regardless of whether they were stolen. This factor weighs in favor of

reliability.

### 4. Predictive Information

"Finally, a tip that provides detailed predictive information about future

---

[6] At the evidentiary hearing and in his reply, Mr. George makes assertions that are inconsistent with Detective Hallam's testimony on this point. (*See* Doc. 48 at 5-6). Detective Hallam testified that the informant saw Mr. George with the firearms firsthand but did not know definitively whether the firearms were stolen. The informant only speculated that the firearms were potentially stolen based on the circumstances. (Doc. 50-1 at 3).

events that is corroborated by police observation may be considered reliable, even
if the tip comes from an anonymous source." *Rowland*, 464 F.3d at 908 (citing
*White*, 496 U.S. at 329-30). Furthermore, if the predictive information "reveals a
detailed knowledge of an individual's intimate affairs," it is more reliable than
information that could be observed by the general public. *Id.*

In *White*, an anonymous informant told police that a woman, the defendant,
would be in a brown Plymouth station wagon with a broken taillight traveling from
a certain apartment complex to a certain motel. 496 U.S. at 329-30. Despite the
fact that the informant was anonymous, the Supreme Court still found reasonable
suspicion when officers saw the brown Plymouth with a broken taillight leave the
particular apartment and head towards the predicted destination. *Id.* It was
significant that the tip "contained a range of details relating not just to easily
obtained facts and conditions existing at the time of the tip, but to future actions of
third parties ordinarily not easily predicted." *Id.* at 332. The Supreme Court gave
credit to the assertion that "because an informant is shown to be right about some
things, he is probably right about other facts that he has alleged, including the
claim that the object of the tip is engaged in criminal activity." *Id.* at 331 (citing
*Illinois v. Gates*, 462 U.S. 213, 244 (1983) (adopting a totality of the circumstances
approach to determine whether an anonymous informant's tip establishes probable

22

cause)).

In *Rowland*, the informant, who was not anonymous, gave a general description of the defendant, predicted his future travel, and accurately stated that he was on probation. 464 F.3d at 908. After the officers confirmed that the defendant was on probation, the Ninth Circuit found it was "sufficient detail to dispel concerns that the tip was a hoax." *Id.*

Here, the informant did not provide any predictive information about future events, only facts that could be corroborated. Detective Hallam was able to corroborate where Mr. George lived, what vehicle he drove, and that he was on probation. Although these facts were accurate, they are not the sort of "predictive information about future events" contemplated by this factor. This factor does not contribute to a finding of reliability.

Nonetheless, the fact that the confidential informant was known, had a proven track record of reliability, and personally witnessed Mr. George with the firearms accords a high degree of reliability. A strong showing of the informant's reliability compensates for a lesser amount of detailed information. *Rowland*, 464 F.3d at 807. Indeed, the informant did not provide a significant amount of information, but that fact is overcome by the high degree of reliability the informant demonstrated. Thus, the Court finds that the information supplied by the

informant was sufficient to confer reasonable suspicion; as such, Detective Hallam and Sergeant Beck were justified in prolonging the traffic stop.

ii.        *Detective Hallam's Questioning of Mr. George*

Second, Mr. George argues that everything after 7:30 p.m., when Sergeant Beck issued the traffic warning, was an unlawful prolongation of the traffic stop. Because the mission of the traffic stop was complete at this point, Detective Hallam's continued questioning of Mr. George was a further prolongation. However, as noted in the previous discussion, the Court finds that the continued questioning was justified by independent reasonable suspicion based on the confidential informant's tip.

Having established that the duration of the traffic stop was lawful, the inquiry turns to whether the subsequent search of Mr. George's residence was constitutionally permissible either as a probationary search or through Mr. George's consent.

b.    *Search of Mr. George's Residence*

Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). A search conducted pursuant to consent is one exception. *Schneckloth v. Bustamonte*, 412 U.S. 218,

24

219 (1973). Another exception, termed the "special needs" exception, exists when there are "special needs, beyond the normal need for law enforcement, mak[ing] the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment)). Probationary searches, as part of supervising probationers, are considered a "special need," excepting them from the warrant requirement. *Id.* at 875.

The government argues that the search conducted of Mr. George's residence was valid pursuant to both exceptions. The Court finds the search was not supported by voluntary consent; nevertheless, it was a valid probationary search, supported by reasonable suspicion.

       *i.*      *Consent to Search*

It is the government's burden to prove "the consent was, in fact, freely and voluntarily given." *Schneckloth*, 412 U.S. at 222 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49. Whether consent was given voluntarily is analyzed based on the totality of the circumstances. *Schneckloth*, 412 U.S. at 227.

The Court will focus on five non-exclusive factors: "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [h]e had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (internal citations omitted).

No single factor is determinative of voluntariness. *Schneckloth*, 412 U.S. at 232-33. Rather, the factors serve as guideposts, "not [as] a mechanized formula to resolve the voluntariness inquiry." *Soriano*, 361 F.3d at 502; *see also United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995) ("although we have established these factors to aid in the decision making process, the full richness of every encounter must be considered. . . Every encounter has its own facts and its own dynamics. So does every consent"). "[I]f under all the circumstances, it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority," then the consent is invalid, and the search is unreasonable. *Schneckloth*, 412 U.S. at 233.

Here, Mr. George's consent was not given voluntarily. Some factors weigh in the prosecution's favor: (1) Mr. George was not in custody, *see Howes v. Fields*, 565 U.S. 499, 510 (2012) ("a person detained as a result of a traffic stop is

26

not in *Miranda* custody"); (2) Detective Hallam and Sergeant Beck did not have their guns drawn; (3) Mr. George was informed of his *Miranda* rights; and (4) he was not told that a search warrant could be obtained. However, these factors are significantly outweighed by the facts that demonstrate Mr. George's consent was only granted in submission to a claim of lawful authority. From the outset, Detective Hallam's interaction with Mr. George was marked by an assertion of inevitable authority rather than a request for cooperation; by stating he was going to conduct the home search under the Probation Office's authority, he immediately signaled that the search was a mandate rather than a choice. Detective Hallam's denial of Mr. George's request to call Officer Fulton for verification further demonstrated to Mr. George that he did not have a choice in the matter. Detective Hallam's eventual "request" for written consent did not overcome his display of authority but rather functioned as a directive: "Okay here's what we're going to do: I'd like to get the written consent." Under the totality of the circumstances, Mr. George's signature on the consent waiver was "no more than acquiescence to a claim of lawful authority."

     *ii.*     *Probationary Search*

Supervising probationers is considered a "special need" that permits "a degree of impingement upon privacy that would not be constitutional if applied to

the public at large." *Griffin*, 483 U.S. at 875. This is because the probationers

enjoy only a "conditional liberty properly dependent on observance of special

probation restrictions" that are intended to provide a "a period of genuine

rehabilitation." *Id.* at 874-75. Probationary searches are not exempt from

constitutional scrutiny; they must still be assessed for reasonableness under the

Fourth Amendment and be supported by reasonable suspicion.

### 1.     *Constitutional Reasonableness*

Although probationary searches are exempt from the warrant requirement,

the search must still be reasonable under the totality of the circumstances. *United

States v. Knights*, 534 U.S. 112, 118-19 (2001); *see also Samson v. California*,

547 U.S. 843, 848 (2006). Whether a search is reasonable "is determined by

assessing, on the one hand, the degree to which it intrudes upon an individual's

privacy and, on the other, the degree to which it is needed for the promotion of

legitimate governmental interests." *Knights*, 534 U.S. at 118-19.

As for the consideration of privacy, it is "[i]nherent in the very nature of

probation [] that probationers do not enjoy the absolute liberty to which every

citizen is entitled." *Id.* at 119 (internal citations and quotations omitted).

Additionally, probationers' expectations of privacy are "significantly diminished"

when they agree to search conditions. *Id.* at 119-20. The defendant in *Knights*

agreed to search conditions that required him to submit to a search "at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114. The Supreme Court held that because the "probation order clearly expressed the search condition and Knights was unambiguously informed of it," Knights's reasonable expectation of privacy "was significantly diminished." *Id.* at 119-20.

On the other side of the balance, warrantless probationary searches are needed for legitimate government interests. The "very assumption of the institution of probation" is that the probationer "is more likely than the ordinary citizen to violate the law." *Id.* at 120 (quoting *Griffin*, 483 U.S. at 880). Additionally, "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration." *Id.* Thus, in balancing these considerations, a probationary search is constitutionally reasonable "when an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity." *Id.* at 121. The holding in *Knights* sets forth the same standard utilized by Montana in establishing the conditions for Mr. George's probation.

Here, Mr. George's search conditions, requiring him to submit to a search of his person, vehicle, or residence at any time "upon reasonable suspicion," are constitutionally reasonable under the totality of the circumstances. Just as in *Knights*, Mr. George was unambiguously informed of the search condition, as evidenced by his initials next to the condition, and signature at the end of the document. (Doc. 43-1 at 1, 3). Thus, Mr. George's expectation of privacy was similarly "significantly diminished." On the other end of the balance, as acknowledged in *Knights*, Montana has a legitimate interest in preventing crime, as probationers are more likely than ordinary citizens to break the law. *Knights* held that these interests are properly balanced upon a finding of reasonable suspicion. Accordingly, the probationary search of Mr. George's residence is constitutionally reasonable if the officers had reasonable suspicion.

### 2.    Sergeant Eckart's Reasonable Suspicion

In Montana, a probation officer may "authorize a law enforcement agency to conduct a search" of a probationer's person, vehicle, and residence if the probation and parole officer "determines reasonable suspicion exists that the offender has violated the conditions of supervision." Mont. Admin. R. 20.7.1101(6).[7]

---

[7] Montana Administrative Rule 20.7.1101 was promulgated by the Montana Department of Corrections under the authority granted to it in Montana Code Annotated § 46-23-1002(3), which states that the department may "adopt rules for the conduct of persons placed on parole or probation."

Here, Mr. George concluded that the search conducted of his residence was not a probationary search because "no one from probation and parole ever made an appearance at any time."[8] (Doc. 36 at 19). This is incorrect. Pursuant to Mr. George's probation conditions and Montana Administrative Rule 20.7.1101(6), Sergeant Eckart was permitted to authorize Detective Hallam and other members of the BPD SCU to conduct a probationary search upon Sergeant Eckart's determination of reasonable suspicion. Thus, Mr. George's argument that this was not a probationary search simply because a probation officer was not present fails.

Moreover, through the information provided by Detective Hallam, Sergeant Eckart had sufficient reasonable suspicion to authorize the probationary search. Pursuant to the first *Rowland* factor, the informant was known to Detective Hallam and thus exposed themselves to civil or criminal liability if the report turned out to be false. Detective Hallam's decision not to disclose the informant's identity to Sergeant Eckart is immaterial to this element. The underlying policy objective is satisfied because the informant remains subject to liability in the event the

---

[8] Mr. George additionally argued in his brief that "there is no documentation supporting that a probationary search was authorized, nor that one was ever requested at any time *before* the traffic stop concluded." (Doc. 36 at 19). However, as previously discussed this factual dispute was resolved at the evidentiary hearing. There is sufficient evidence to support Detective Hallam and Sergeant Eckart's assertion that the probationary search was authorized before Detective Hallam arrived at the traffic stop.

information was false or fabricated. For the second *Rowland* factor, Sergeant Eckart testified that he did not know whether the informant had a proven track record of reliability. As to the third *Rowland* factor, Detective Hallam told Sergeant Eckart that the informant saw Mr. George with the firearms; thus, Sergeant Eckart knew it was based on the informant's personal observations. Lastly, as discussed above, the informant did not provide predictive information about future events.

Though only two of the four *Rowland* factors directly support the informant's reliability, the totality of the circumstances establish the requisite reasonable suspicion. When viewed as a whole, it was reasonable for Sergeant Eckart to believe that Detective Hallam's confidential informant was telling the truth about seeing Mr. George with firearms, and form a reasonable suspicion that Mr. George was violating the terms of his probation. Accordingly, the search of Mr. George's residence was legally justified under the "special needs" exception to the warrant requirement for probationary searches.

## IV. Conclusion

**IT IS HEREBY ORDERED** that Mr. George's Motion to Suppress (Doc. 35) is **DENIED.**

The Clerk of Court is directed to notify the parties of the making of this

Order.

DATED this 10th day of February, 2026.

WILLIAM W. MERCER
UNITED STATES DISTRICT JUDGE